Case number 23-1236, Kimball Wind, LLC petitioner versus Federal Energy Regulatory Commission. Mr. Coyle for the petitioner, Ms. Chu for the respondents, Mr. Ross for the interveners. All right, Mr. Coyle, good morning. Good morning, Your Honor. I hope the podium's the right height. Can you hear me all right? Yes. Great, thank you. Good morning, Your Honor. May it please the court, my name is John Coyle of the firm Duncan & Allen, LLP, for petitioner Kimball Wind. This case ultimately turns on a question of statutory construction and the correct meaning of Section 211A of the Federal Power Act. The commission correctly held that the statute does not specify who may seek relief or who may obtain relief under Section 211A. The statute simply says that the commission may order an unregulated transmitting utility. There is no dispute that the Western Area Power Administration is an unregulated transmitting utility. To provide transmission services, and I'm summarizing on rates, terms, and conditions comparable to those on which the unregulated transmitting utility provides service to itself. There is no clearer example that I could imagine of disparate treatment than the one presented in this case, where the Western Area Power Administration funded one-third of a network upgrade, a sectionalizing substation, and I'll be happy to explain in as untechnical terms as I can what that means. There isn't really a dispute that it's a network upgrade. You say no dispute that it's a network upgrade, but the statute refers to transmission services and how those need to be comparable with respect to the cost. That's correct, Your Honor. And so that's what my question would be, that you're speaking of recouping your outlay of costs with respect to a network upgrade, but the statute refers to transmission services. That's correct, Your Honor. And at rates that are comparable to those that the unregulated transmitting utility charges itself. In this case, there's no clearer example of disparate treatment. WAPA paid one-third of the cost of the substation. No, but what I'm asking is that you're contending that upgrades flows into the definition of a transmission service? Well, there's an intervening step, Your Honor, which is cost recovery under rates and the treatment of those investments. And in this case, the investments in the facility were treated disparately. Western recovers its investment through its rates, while Kimball Wind was directly assigned two-thirds of the cost, $5.93 million, and does not recover those costs through rates or any other arrangement. That is about as incomparable an illustration of transmission service being provided, not to Kimball Wind, I'll concede, and that may be part of Your Honor's question, but to the purchasers of Kimball Wind's output. If your question is, where's the nexus to transmission services? Correct. I'm sorry to be slow on the uptake, Your Honor. Then the issue is, okay, the requirement that Kimball Wind absorb two-thirds of the costs of the network upgrade was imposed by Western as a condition of providing transmission service to its customers. The Municipal Energy Association of Nebraska, or MEAN, and its member utilities, were municipal utilities in the state of Nebraska. In plain English, in order to move the output of Kimball Wind's generating facility over Western's transmission system, Western imposed this condition. The commission argues, well, but you're not eligible, Kimball Wind, for relief because you're not a transmission customer or interconnection customer. That's true. We never contended that we were. However, the statute, Section 211A of the Federal Power Act, is not so limited. In contrast to other provisions of the Federal Power Act, as the commission correctly held, Section 211A does not specify who can seek relief or who can obtain relief. What Section 211A operates on is transmission services and transmission rates. And would you not consider what you were doing a construction service? A construction service. Construction service. No, I wouldn't. No, I wouldn't. I wouldn't because the only reason to do it was in order to enable the output of Kimball Wind's generating facility to be delivered to its customers. But there are transmission service agreements, and you didn't enter into a transmission service agreement. That is correct, Jemima. There is no dispute here that Kimball Wind is not itself a transmission customer of the Western Area Power Administration, nor is it an interconnection customer of Western. However, Kimball Wind's customers are transmission customers of Western, and Kimball Wind was hit with two-thirds of the costs of this facility that benefits all transmission customers on Western's system as part of its customers, who are also Western's customers, efforts to obtain network transmission service through which the output of Kimball Wind's facilities would be delivered to those customers. So we ultimately need to make a finding, essentially, that you would stand in the shoes of Western with respect to that transmission service. Not that we'd stand in the shoes of Western. Or have some type of affinity or agency. Well, I think what you mean to say, if I could, and I don't mean to put words in your mouth, is that it's not exactly that we stand in the shoes. It is that we have a sufficient relationship to Western's provision of transmission services at rates and terms and That's fine, Your Honor. We don't exactly stand in the shoes of MEAN, although we are aligned with MEAN because we serve MEAN. We can't serve MEAN without MEAN obtaining the transmission service they need to take delivery, and Western's provision of that transmission service was conditioned on Kimball Wind funding two-thirds of the costs of a substation that benefits all users of the Western transmission system. I think that's about as plain as I can put it. Fair. What do you say about FERC's characterization of Kimball Wind as an off-system network resource for MEAN? You know, honestly, Your Honor, I'm not sure what they mean by that. I think what I would suggest is the Commission throughout the case has drawn the distinction, and I'll outline it for you, that Kimball Wind is not directly interconnected to the Western transmission system, and that is also true, and it is undisputed. Kimball Wind is directly interconnected with the 115 kilovolt transmission system. Sorry, I try not to speak in acronyms here. Kimball Wind is directly interconnected to the 115 kilovolt transmission system of the City of Kimball, Nebraska, and Kimball, Nebraska is interconnected with the 115 kV Archer-Sydney line that is owned by Western. So, yes, there's an intervening utility, and we're not directly interconnected. I don't think that matters in the context of Section 211A. Section 211A does not say relief is only available to customers who seek interconnection service. It says the Commission may order an unregulated transmitting utility to provide transmission services under terms and conditions or at rates that are comparable to the rates that it charges itself. But it doesn't say to whom it is to provide transmission. That's correct. That's correct, Your Honor, and I think that the statutory phraseology, if I could, is one of the important textual clues that the Commission neglected to consider in its construction of the statute. What the statute focuses on, first of all, I mean, we have three textual clues here that the Court should pay attention to in construing 211A. One is the Commission's own recognition in its May 4th order that the statute doesn't specify who may seek relief under Section 211A. So, the statutory text doesn't limit relief, number one. Number two, the statute's use of the word comparable as a test of what the Commission may order to happen had a well-understood meaning by 2005 when Section 211 was enacted, and this Court in the Alabama Municipal Electric Authority case that we cite in our reply brief, in particular 662 Fed 3rd at page 574, speaks at some length about what comparability means. It was a change in the Commission's policy about what is undue discrimination, which is prohibited, as the Court is aware, under other provisions of the Federal Power Act. The Commission changed its focus on undue discrimination to say it is not so important that an actor, a utility, discriminate among classes of customers. So, the focus on comparability goes from being horizontal, if you will, discrimination among different classes of customers, to being vertical. Does the utility treat people the same way that it treats itself? Does it treat those who use its system the same way that it treats itself? And in this case, that is clearly not the case. You cannot imagine more disparate treatment. I'll recover my investment. You don't recover yours. And by the way, you're going to eat two-thirds of the facility. Finally, under Section 211, the focus is not on actors. It's on action. It's on transmission services. So, the attempt to say, well, the statute is limited, or it's limited in this case, to the provision of relief to transmission customers or interconnection customers has no basis in the statute. The Commission is engrafting that requirement, which we submit is contrary to the plain language of the statute. In order to justify, and this is my second point, in order to justify what it's done, the Commission then dances the flamenco on generations of precedent that say you can't directly assign the cost of network upgrades, which is why, as childs, I use the expression network upgrades. Network upgrades benefit every user of the system. There is a clear line of Commission precedent cited in our briefs that sectionalizing ring buses, because they improve the reliability and availability of a critical transmission line, are network upgrades. Again, that isn't in dispute, as far as I'm aware, and the policy behind it. But your ultimate relief you're seeking is the refund of your construction costs. Yes, Your Honor. Okay. So, here, the statute is indicating that the unregulated transmitting utility can't offer itself rates that are less than comparable to another.  So, how does refund fit into this statute? Right. So, there are a couple of different ways to effect treatment of Kimball Wind's capital expenditures that do not discriminate against Kimball Wind. One is Western includes its investment in rate base and, through its transmission rates, receives a recovery of and on its investment. Okay? They could treat Kimball Wind's investment the same way and pay off Kimball Wind's investment over time through transmission rate credits, which would be provided to MEAN or its members, and there would then be a third-party agreement which would flow those payments back to Kimball Wind. Well, you could have entered into such an agreement, but you didn't. The question is, what possible construction of the statute would authorize the Commission to order everybody to enter into this agreement? Well, I think, Your Honor— It's well beyond the terms of an order to adjust rates or terms of service. I— With respect, Your Honor, I would disagree. As we pointed out at some length in our pleadings, the Commission does this all the time in connection with generator interconnection. Well, not under this statute. It's dealing with an unregulated— Correct. —utility. Correct. It's got a—basically, a limited sovereign waiver of sovereign immunity to—which this is what this is—to order them to do things. Go ahead and finish how you can finally—it's true, everything that you've said applies fine outside of this statute. Yep. And how you've described FERC's practices, I believe, too, but it's just that you have a problem. You're operating under a very limited grant of authority and discretionary authority, am I right? Let me take the second point first, Your Honor, since I've got about 30 seconds left. This case does not involve an exercise of Commission discretion. It involves the Commission's interpretation of the statute. If that interpretation is incorrect, and it is for the reasons we've shown, then the Commission's order is arbitrary and capricious. So discretion is reviewable in this case, and in this case, the erroneous construction of the statute makes the ruling arbitrary and capricious. To get back to whether Section 211A authorizes the Commission to direct comparable treatment of Kimball Wynne's investment in this facility, it does. Clearly, it does. Under both rates and terms and conditions of service, all the Commission would have to do is to say—which it has done in other contexts under Section 211—direct the Western Area Power Administration to enter into an arrangement. They don't have to specify the arrangement. Enter into an arrangement with Kimball Wynne, and if necessary with mean, that does not treat Kimball Wynne's investment in this facility on a disparate basis compared to what the Commission— It could even be a lump sum, the way you described it. You pay them $5 million. It could, but—excuse me, but the Commission doesn't— Reimbursement or refund from a statute that is all about very limited relief. Well, it's about rates being comparable, Your Honor, and the rates that are involved in this case and the terms and conditions of service in this case are not comparable. Initially, there was some discussion, at least the meeting notes reveal, of doing a third-party agreement with respect to the $2.2 million, I guess between 2.9, never with respect to this portion. Why is that? Why did you enter into such— Your Honor, I don't believe that that point was clarified, and the chronology is a little murky about when Western said, our commitment to provide transmission rate credits is limited to the money that we were prepared to spend to upgrade Kimball TAP, which is what the Kimball substation used to That, I believe, did not arise initially, and it was Kimball Wynn's understanding, at least, that it would be receiving transmission rate credits through its customer mean. What's the record show about that? Where is that? Pardon me, Your Honor. $1.93, the notes of the meeting. Yeah, I think that's correct, Your Honor. That is the correct reference. That's it? Well, that's the one in which it says, network credits will be applied against Mean's transmission bill, and Mean will then pass the credits on to Kimball Wynn. A three-party agreement will be established. Well, it didn't happen. Right. And it was only with respect, initially, to the notes reveal, to— In any event, why didn't you do it? You didn't do it. That's the problem. Your Honor, it is— Somebody pulled out, right? Your Honor, it is inevitably the case that a party seeking transmission service, or seeking, in this case, to be designated as a network resource, has a choice either to honor its contract with the purchaser, if it's off take, or not. In this case, the transmission service was necessary in order for Kimball Wynn to deliver its output to the customers under its power sales agreement. Now— But since it wasn't interconnecting directly, it should have sought some arrangement to secure its— Well, Your Honor, it tried, and I think the record honestly reflects that they thought they had, or that that would be an item for discussion later. But in fact, you're right. They— Kimball Wynn was not offered a choice. They were told, if you don't pony up the money, Western says, we're not going to provide transmission service. The contract, the power sales agreement, between Kimball Wynn and Meen had a rather strict deadline in it as to when delivery was supposed to start that did not admit of Kimball Wynn going off and trying to build its own transmission network or find some other means of delivering the power. There was no other option for it. The same situation arises, for example, in Western Mass Electric, in this court's case, Western Mass Electric, 165 Fed Third, where there was a contract in place under which an interconnecting generator had agreed to fund network upgrade costs. So we don't care what contract you signed. The fact of the matter is this is incomparable service. It's therefore not permissible. In that case, under Section 205 of the Federal Power Act, in this case, we argue the same principle would apply under Section 211A, because the statute says the commission may direct an unregulated public utility to provide transmission services on a basis comparable to those that the unregulated transmitting utility provides itself. It's not that complicated. And I'm way over time. We'll give you a couple minutes and we'll talk. Thank you. Ms. Chu. Good morning. May it please the Court, Susanna Chu for the Federal Energy Regulatory Commission. If I may, let me try to follow up on some of the factual questions that Judge Ginsburg, I believe, was asking. Relating to these approximately $2.2 to $2.9 million in network upgrades that WAPA reimbursed to itself, at JA183, you will see that the facilities agreement from 2017 specifies that $2.2 million, that was the current estimate at that time, qualify as network upgrades and are eligible for network credit. Then further down on that page, it provides a cost estimate as to the rest of the upgrade costs. And it makes clear that these are not, the remainder of those costs, the costs that ultimately were footed by Kimball Wind, were not considered network upgrades. These are a different category of costs. So despite knowing this, Kimball Wind, in 2018, entered into a construction contract under which it agreed to pay for those upgrade costs. So it went into the contract discussion and signed a contract fully aware of how these costs would be allocated. Judge Childs, you were asking about how refunds fit into the statute, and the short answer is that they don't. Under 211A, as you were discussing earlier, the question is whether there is a unregulated transmitting utility that is providing transmission service on terms that are not comparable to the services it's providing to itself. So there's a real disconnect here between what Kimball Wind is asking for and what the commission has authority to order under section 211A. As the commission recognized in the complaint order at paragraph 47, JA 378, there is no provision of the Federal Power Act that grants the commission the authority to order refunds by governmental entities like WAPA that are exempt from the commission's jurisdiction under section 201F. That's the general exemption provision. It's 16 USC section 824F. So the commission here is acting as a creature of statute, and it's applying the provisions of section 211A to this contractual situation, and it found that there are simply there's no transmission service agreement, no interconnection agreement that it has the authority to reach. My friend Mr. Coyle referred to the Western Massachusetts precedent. That's a order in which the commission did order a jurisdictional transmission provider to provide credits for network upgrades. But a couple things here. First of all, that was a generation plant that was directly connecting to a transmission provider. Those parties were jurisdictional. There was a generator interconnection agreement that was within the jurisdiction of the commission to regulate. And moreover, in that case, the commission actually was assessing witness testimony about whether the enhancements actually benefited the entire system rather than being enhancements that were solely for the purpose of interconnecting that particular generator. You do indicate that the statute does not specifically speak to who can obtain relief, and so therefore we allow Kimba Winn to petition. And also because they do have an order that affects them, so that's why they're here. But then you separate that from that they can't get relief under this statute. So what are the circumstances that Kimba Winn would be under the statute? Right, so that's the who. That's right, your honor. So of course, yes, the commission said that it was fine for Kimba Winn to come before and ask for relief, but it was not actually entitled to relief under 211A. And I think that goes to the commission's findings that there's no transmission service agreement and Kimba Winn or interconnection agreement, and Kimba Winn isn't even asking for one of those agreements from WAPA. So there's a real contractual disconnection there. But moreover, the commission also found that Kimba Winn and WAPA are not similarly situated for purposes of this statutory provision. As Mr. Coyle was explaining, the concern under Section 211A is that the transmitting utility needs to be treating the interconnection customer, the transmission customer, on comparable terms that it's treating itself. But here, the commission explained in the rehearing order and in the complaint order that they're not similarly situated. This is at a rehearing order, paragraph 18, JA390. The commission said that the amount that WAPA paid for its upgrades were incurred in its capacity as a transmission provider. And these were part of previously planned reliability upgrades. WAPA was already going to do something at that substation to increase the reliability on its grid. And then the cost assigned to Kimba Winn, said the commission, were due to the designation of the off-system Kimba facility as a network resource for mean. So they're just not, they're not in the same shoes, Kimba Winn and WAPA. You know, WAPA is acting as a transmission provider. Kimba Winn is not even a generator in this situation. It's an off-system resource. Well, it's a peculiar term. I mean, that is, it is generating power. Yeah. Oh yes, your honor. I know. And I, I understand it. It is, it's a bit of a, a complicated circumstance in terms of the actual connections. It doesn't matter if it's a generator or a generator. Would that make a difference here? No, I don't think it would make a difference. I mean, it is a generator. It's, it's just that it is not directly interconnected to WAPA. It's, it's interconnected to a transmission line owned by a party that's not before the court, the city of Kimball. And it's the city of Kimball's transmission lines that are connected to WAPA. I think, and I don't, sorry. Instead of a third-party agreement, well, pardon me, instead of a, credits going back from Western to, to, first to the city and then to, and then to Kimball, would Kimball have entered into an agreement to sell power to the city at a price that would have reimbursed it for this? And then the city then selling the power to, to Western? Uh, well, I'm not sure your honor, because the city, I believe is just a transmitting. Well, I, I'm not sure if the, if the, the city wanted to purchase power, but, but the arrangement, I think what, sorry. Probably just not. I mean, that's a complication for them, but, um, it does seem to me that, that with a little bit of foresight, this could have worked out for Kimball. Well, your honor, actually, I think the, the answer is here that, um, Kimball has a long-term power purchase agreement with being the municipal agency and mean is the actual transmission customer, right? Mean actually contracts with generators and it contracts with WAPA and other transmitting utilities to bring power to its own customers. So what happened here is there's a 20 year power purchase agreement between Kimball wind and mean, which is in the record. And that shows that Kimball wind is receiving 20 years of compensation for all the output of its 30 megawatts of wind generation. So mean, of course, it's not here before the court, but it would seem to me that those contractual arrangements, you know, those are the compensation that Kimball is receiving and the amount that it has to pay for upgrades necessary to bring its power to its customer mean are basically the cost of doing business. I mean, this is all outside the record. I'm sorry. I'm sorry. Right. Yes, apparently they did. This is the facility study done by, right. By, by Western, by WAPA. Yes. Western. Yes. So if the requester, the requester is Kimball, right? Oh, the requester was mean and this facility says, because the mean was requesting the study, but after the study being used to construct, if they could do so. So ultimately they engaged Kimball to construct. That's right. My understanding is from the Kimball complaint after the facility study mean informed WAPA that any contractual arrangements would need to be negotiated with directly with Kimball. And so being stepped back and mean has not been, it's not before this court. It didn't participate actively in the agency proceeding either. So you're right, your honor. So JA 183, you know, that's the notice from 2017 about all of the costs and how they would be allocated. And at JA 215, that's the contractual provision providing for the compensation exact in, you know, it's specifically says that Kimball wind upon execution of this contract will advance to WAPA, the sum of $4.28 million. So, Kimball went in with eyes wide open and entered into that contractual agreement. And what's happening now is the, you know, the contract is what governs that relationship and the commission simply doesn't have the authority to go in and rewrite those contracts for Kimball wind. There's just no basis for it in the federal power act. Under 211A, do you read that to say only a transmission customer can obtain relief? I think under 211A, your honor, it's, it would be a transmission customer or someone who's asking for interconnection. So a customer or someone asking to become a customer. And, you know, these relationships are governed by transmission service agreements or generator interconnection agreements, neither of which are present here. And in terms of how we would write our opinion, would your suggestion, if we were to rule for you, be that it'd be narrowly constructed to just say the relief is not there because the statute does not provide for the refund. And then that be it, not go into who's a customer, who's not, who's, is there a transmission agreement, services agreement, et cetera. If the court were so inclined, I think that that would work just fine. I, you know, I don't know that it's necessary to go into all of that. I mean, that was one of the bases for the commission's decision. But I think that is, you know, that's certainly one of the bases for the commission's decision as well, that there's just no, you know, what Kimmel Wind is asking for is not covered by 211A. All right. Thank you. Thank you, Your Honor. Mr. Frost. Thank you, Your Honor. Kason Ross for the Western Area Power Administration. I think I'll pick up on a theme that Ms. Chu concluded with, namely the, this dispute concerns terms of a contract that was duly agreed to by WAPA and Kimmel Wind. And after Kimmel Wind received the benefit of its bargain with WAPA, it's now asked FERC to unwind the terms of that duly agreed to contractual arrangement under Section 211A of the Federal Power Act. But that provision provides FERC only limited authority to oversee unregulated transmitting utilities like WAPA and provides the commission authority to direct WAPA to provide transmission services on terms that are not discriminatory or preferential. But as Petitioner's Counsel admitted this morning, WAPA is neither a transmission provider nor an interconnection provider for Kimmel Wind itself, nor did WAPA, or excuse me, nor did Kimmel Wind ask WAPA to provide those services. So FERC understandably rejected Kimmel Wind's petition, concluding that it lacked the statutory authority to provide the kinds of relief that it requested. As Judge Childs recognized this morning, essentially what Kimmel Wind has asked for is a reimbursement for the terms of its contract. And as Judge Ginsburg recognized, that could have been contemplated by a three-way crediting agreement with the Municipal Energy Agency of Nebraska, but those are not the kinds of relief that Section 211A contemplates, which is strictly the provision of transmission services. Neither of those terms, either a refund for a contract that was satisfied and that Kimmel Wind has now benefited from, nor a crediting arrangement with another municipal agency that is not before this Court and which did not participate in the underlying contracted issue would be properly contemplated by Section 211A. As Judge Ginsburg recognized, some foresight might have avoided this entire dispute, but that foresight would have required the participation of another agency who simply opted not to participate in this the Municipal Energy Agency of Nebraska. Ultimately, Kimmel Wind's dispute may be with them, but that is not the kind of relief that FERC can provide under Section 211A of the Federal Power Act. Can I ask you, I've got a chart that says Kimmel Wind has an interconnection and wheeling agreement with the City of Kimmel. The City of Kimmel then has an interconnection agreement with you all, with Western. What would it have taken, what type of agreement, if possible, would it have taken for Kimmel Wind to be a customer direct or indirect of Western? I'm not sure, to be completely honest with you. I think the initial three-party crediting agreement that WAPA would have entered into with MEAN and Kimmel Wind would have been some semblance of the terms that you're describing, Judge Henderson, but it's not clear. And under the terms of that arrangement, so far as I understand, WAPA would have provided network credits to MEAN and MEAN would have passed through the value of those credits to Kimmel Wind. Indeed, that's one of the forms of relief that Kimmel Wind has sought from this Court and which the Commission reasonably determined it could not provide under Section 211a. But irrespective of that, the characterization of the relationship between WAPA and Kimmel Wind, it's clear that as Petitioners' Counsel admitted this morning, Kimmel Wind is not either type of customer, either an interconnection customer or a transmission service customer of WAPA. Now, MEAN is, but that does not affect the analysis here as the Commission reasonably determined. FERC called it an off-system network resource. Is that a term of art? There again, I'm not sure. I think in FERC's presentation this morning, it suggested that was simply a characterization of the fact that the Kimmel Wind facility does not directly connect to WAPA's transmission network. As Ms. Chu explained, there is a portion of line that's owned by the City of Kimmel, Nebraska, that's not owned by WAPA, and that line connects to WAPA's transmission network. And so I think that's why it would have been referred to as an off-network source, but I'm not entirely certain. How did you determine the allocation of costs between you all and Kimmel Wind? I think that was just the nature of the contractual agreement. The $2.2 million that WAPA agreed to pay was previously ascertained costs to upgrade its network. And then the initially, I believe, $4.2 million, which ended up being nearly $6 million that Kimmel Wind would pay, were simply upgrades to WAPA's substation in Nebraska to be able to facilitate the provision of power from a larger wind farm. I believe initially it was a 15-kilovolt wind farm, and now it's a 30-kilovolt wind farm. But in order to provide twice the amount of electricity, WAPA needed to upgrade its substation to accommodate that larger flow. So I think that was just agreed to through the course of negotiations. And as Ms. Chu explained, that was a duly agreed-to contract between Kimmel Wind and WAPA. There's no argument here, so far as I understand, that there was any kind of malfeasance in the negotiations. And in fact, so far as I can tell, Kimmel Wind is receiving the benefit of that bargain by providing energy to residents of Nebraska and other western states. It's actually a fair inference that since they went ahead with the construction, even though that cost was allocated to them, that they regarded the revenues from the 20-year sale of the wind as sufficient to make it still a profitable investment. This would be a double recovery. That's certainly possible, but I think maybe a better question for Kimmel Wind's counsel on rebuttal. All right. Thank you, Your Honors. We urge the Court to deny the petition. Let me start with something that seems to be troubling the Court, which is assuming that you rule in Kimmel Wind's favor and remand the case to the Commission, what does the Commission do on remand? The Commission has authority on remand under the statute, the plain language of the statute, to direct Western to provide transmission service for the delivery of Kimmel Wind's output on the same basis as it does other generation that's on that system. What that would then require, in our view, is for Western to re-evaluate its disparate treatment of Kimmel Wind's contribution to the capital costs for Kimmel substation. The Commission does not have to say refund. It doesn't have to say network credits, although those are two obvious ways to affect the relief. But what would happen in the ordinary course is the Commission would direct Western to reconsider its treatment of Kimmel Wind. The idea that there is a contract in place doesn't differentiate, and I mean the Western construction contract 2913, does not differentiate this case in any material basis from any of the other cases in which interconnecting generators were compelled to execute interconnection agreements with transmitting utilities, which were subsequently found by the Commission to be unjust and unreasonable because they did not provide comparable service. The direct assignment of network upgrades is flatly prohibited by other provisions of the Federal Power Act. It's not comparable service, and it can't be comparable service here, period, full stop. I wanted to respond briefly to Judge Ginsburg's question about double recovery. It's not double recovery, Your Honor. There was no budget anywhere, no indication of a budget anywhere for the $6 million that Kimmel Wind got stuck with on this deal. What Kimmel Wind had a choice to do was to comply with its contract with me or not. And what Kimmel Wind did in this case was to honor the time-honored labor setting, work now, grieve later, okay? Get the power flowing, get the facility built, figure out the cost allocation later on. That's why we're here. The other point I wanted to raise briefly, Ms. Chu made a couple of references to this being different, that because Kimmel, because Western had planned on spending $2.2 million on upgrades, that Western's contribution to the Kimmel substation costs is somehow in a different category than Kimmel Wind's contribution to those costs. And that's just nonsensical when you think about it. Allocating the cost for the same facility on a different basis, one where Western gets rate recovery and the other where Kimmel Wind has to absorb its $6 million share directly, is not in any sense comparable. And again, this situation is no different than the situation that the commission has confronted in connection with other construction, with other interconnection cases where a utility, transmitting utility argues, well, we would not have to have incurred this cost but for this utility's interconnection. That's exactly what this is. It's a but-for argument. We, Western, would not have had to upgrade Kimmel Tap, the Kimmel substation, if Kimmel Wind hadn't come along and wanted to put its energy on our transmission system. That's fine. But the point, the commission's analytical point in all of the case law that it disregards in this case, is that really doesn't matter. Causation is not important. What is important is that every user of the system benefits from that sectionalizing substation. And that is a fact. That is an ineluctable fact, well settled under precedent, which everybody seems to want to ignore. I thank you. I have nothing further to add. I appreciate the court's time. All right. Thank you.
judges: Henderson; Childs; Ginsburg